### Ben Carter, et al. v. Robert Carter, et al.

(Decided November 23, 1926.)

Appeal from Warren Circuit Court.

1. Appeal and Error.—Unless verdict is palpably against weight of evidence, appellate court will not disturb it.
2. Wills.—Verdict that testator was mentally incapable of making will and that purported will was not his last will and testament held not against preponderance of evidence.

RODES & HARLIN for appellants.

W. B. GAINES and N. P. SIMS for appellees.

Opinion of the Court by Judge Sampson—Affirming.

The will of Bailey P. Carter, who died a resident of Warren county in 1924, is in contest in this action, instituted by some of his children against his widow, a son, a grandson and trustees of the Pleasant Hill church. A jury found the papers not to be the last will and testament, nor the codicil of the deceased. Those papers read:

"I, B. P. Carter being of sound mind make this my last will. First, I give to each one of my children the sum of five ($5.00) dollars cash. Second, I wish all my just debts and burying expenses paid. Third, I give all the remainder of any property both real estate and personal property to my wife, Sarah Jane Carter, during her life to use as she chooses and at her death if there is any part of my estate left I then give the remainder to my grandson, Orbin Carter, if my grandson dies before my wife, Sarah Jane Carter, does, then I wish the remainder to be given to Pleasant Hill church to maintain said church and keep same in repair. No timber to be cut off of my farm only for the use of my wife, Sarah Jane Carter. I appoint my wife executrix without bond.

"Given under my hand this December 23, 1919.

(his)
"B. P. x Carter.
(mark)

Witness: Euclid Hardcastle,
          H. C. Moody."

"Dec. 4, 1922. Bowling Green, Ky.

"Codicil to my will, dated December 23rd, 1919, I wish to give to Pleasant Hill church the sum of fifty dollars as soon as this will is probated after my death, the fifty dollars shall be used by the church for the purpose of lighting same of buying a light for church as the officers see fit. Given under my hand this December 4th, 1922.

(his)
"B. P. x Carter.
(mark)

"Witness:
Euclid Hardcastle,
Will Osborne."

The contestants charge that the deceased was mentally incapable of making a will, and also charge that he was unduly influenced by the beneficiaries in the making of the will and codicil. The due execution of the paper was proven by the two attesting witnesses. The contestants then introduced about a dozen witnesses who testified, in substance, that the testator was not at the time of the making of the will and had not been for some years theretofore and thereafter, of sufficient mentality to understand and appreciate the nature and value of his property, his duty to his family, the objects of his bounty, and was not mentally capable of making a rational survey of his estate and dispose of it according to a fixed purpose of his own. The court submitted to the jury only the question of mental capacity to make the will, thus holding, it would seem, that there was not sufficient evidence of undue influence to carry the case to the jury upon that question. Among the witnesses for the contestants was Dr. W. A. Francis, a regularly practicing physician, now located in Bowling Green, but formerly residing in the country five or six miles from Bowling Green in the neighborhood where the testator lived. The witness stated that he had been practicing medicine for about forty-seven years and had been the family physician of the deceased for several years before his death, and had professionally treated the testator on several occasions. When asked if the testator had, during the time the doctor had known him, sufficient mind to make a survey of his property, and knew the objects of his bounty and have sufficient will power to dispose of his property according to a fixed purpose of his own, the witness said: "No, sir, I don't think so; I do not think he could concentrate his mind long enough on anything, because he might be talking to you on one subject and in a second he might be talking to you about something else. He was not very bright in the beginning. He had some kind of infection that threw him down and for weeks after he would not be able to do anything—some kind of heart trouble—and part of the time he was unconscious or semi-conscious, and would reach out and pull things to him and mutter." The witness then testified that the testator about the time of the making of the will charged the witness, his family physician, with stealing chickens and eggs.

"Q. Did you resent that? A. No, he was childish and I did not care anything about it. . . .

"Q. All the years you have known him you say he was weak mentally? A. Oh, yes.

"Q. Was he a man who was easily influenced? A. Oh, yes, just like a child."

The witness also related several circumstances in the life of the deceased which tended to show that he was childish and not well balanced mentally. At the time of the making of the will the testator was about eighty-one years of age and he lived about two years thereafter. The lay witnesses gave testimony concerning numerous incidents in the life of the testator which indicated he was mentally weak or was unbalanced in mind. Some of this evidence was quite convincing, while much of it was concerning minor matters and had little relevancy and less probative value.

For the propounders Dr. W. F. Cartwright testified that the testator was a man of good common sense and fully able to know the objects of his bounty, make a survey of his property and dispose of it according to a fixed purpose of his own. Dr. Cartwright testified that he had been practicing about twenty-five years in and around Bowling Green; that he graduated from Vanderbilt University and had professionally attended the testator in his illness.

"Q. From your personal contact and acquaintance with him, and your chance to observe him, and from your knowledge of him, I will get you to state if, during any of the time that you saw him when you would be at your office and he would be to see your father and when you would be there to see his wife and you treated him, did you observe from his actions or conduct anything to indicate that he was of unsound mind or that he didn't know his children, or what he had or wouldn't know his acquaintances or anything of that sort? A. No, sir.

"Q. Did you ever at any time observe in the old man anything that was abnormal so far as mental faculties were concerned? A. No, sir. . . .

"Q. During all these times that you saw him and was with him, did you consider him of unsound mind? A. No, sir.

"Q. It was testified here by one man that he was an imbecile. Did you ever see anything in his manner or his conversation to indicate that he was

an imbecile, or in such a condition as that? A. No, sir, nothing whatever.''

Some twenty or more lay witnesses testified, in substance, that the testator was a man of good commmon sense, though uneducated, and was fully able to make a survey of his property and was not unaware of his duty with respect to the objects of his bounty. While there were more witnesses who testified to the normal mental condition of the testator than there were persons testifying that he was mentally unbalanced, it cannot be said that the verdict is palpably against the weight of the evidence. The jury no doubt knew the witnesses and perhaps the parties, and was able to judge of their credibility, and unless the verdict is palpably against the weight of the evidence this court is not authorized to disturb it. It cannot be said in this case that the verdict of the jury is flagrantly against the weight of the evidence, although it does appear that the majority of those testifying support the contention of the propounders of the will. No complaint is made of the instructions of the court submitting the case to the jury, nor of anything save that the verdict of the jury finding the paper not to be the last will and testament of the testator is flagrantly against the weight of the evidence.

As there was much evidence heard by the jury warranting the verdict returned, it can not be set aside as unsupported or as flagrantly against the evidence.

Judgment affirmed.