Belle **HOLLON'S EXECUTOR** (Herbert Holbrook) et al., Appellants,

v.

Josie **GRAHAM** et al., Appellees.

Court of Appeals of Kentucky.

Dec. 3, 1954.

As Modified on Denial of Rehearing June 24, 1955.

Gardner & Gardner, West Liberty, O. J. Cockrell, Jackson, Earl Rose, Beattyville, for appellants.

Shumate & Shumate, Irvine, J. Douglas Graham, Campton, for appellees.

STEWART, Chief Justice.

This is an appeal from a judgment of the Menifee Circuit Court wherein it was adjudged that an alleged lost joint will of Isaac Hollon and Belle Hollon, his wife, both deceased, dated "——day of November, 1925," herein referred to as "the 1925 will," was the last will and testament of these two decedents, and that an individual will of Belle Hollon purported to have been executed August 7, 1951, herein referred to as "the 1951 will," was not the last will and testament of this decedent, because the jury found she did not have testamentary capacity when it was executed and, in addition, she was subjected to undue influence at the time. We shall hereinafter refer to the Hollons as "Isaac" and "Belle."

Isaac died on February 1, 1942, predeceasing Belle. On February 15, 1947, an individual will of Isaac's was recorded in the Wolfe County court clerk's office which by its terms left Belle all his property for her life, but no provision was made in this instrument for a disposition of the remainder of his estate after her death. This will was dated February 3, 1901, and is herein referred to as "the 1901 will."

Belle died May 22, 1952, and the 1951 will was offered for probate in the Wolfe County Court. Appellees appeared in protest and asked probation of the 1925 will as the true will of these decedents. The county court, after rejecting the 1951 will, held that the 1925 will was the true last will and testament of Isaac and Belle and admitted it to probate. That court also adjudged the 1901 will null and void, declaring it was recorded in the county court clerk's office by either fraud or mistake, that no application was ever made to probate it, and that there was never any probation had in connection with the instrument. This proceeding was appealed to the Wolfe Circuit Court and then moved to and determined by the Menifee Circuit Court when a motion for a change of venue was sustained. The appeal is from the latter court.

Appellants raise and argue the following points in their brief: (1) There was no evidence of probative value introduced to show that Belle was mentally incapable of making a will on August 7, 1951, or that she was subjected to undue influence in connection therewith; and (2) the 1925 will should be rejected because the essential elements to establish it were not proven. The admissibility of certain evidence is questioned, and we shall discuss this at the proper place. Any contention as to the validity of the 1901 will of Isaac's had been abandoned.

Isaac and Belle died childless, leaving a joint estate of approximately $100,000, which they had acquired through industry, shrewd trading and thrift. They had raised a number of children; some of these were related to them by blood and others were unrelated orphans they had taken in and given a home. On the first of August, 1951, Belle, then about 84 years of age, suffered a stroke which temporarily paralyzed one side of her body, and she was thereby rendered physically helpless. Her mouth and tongue were swollen, so much so that she had great difficulty in talking. The evidence also shows that her eyesight was impaired but it is not too clear whether the impairment was the result of the stroke or of infirmity arising from her advanced age.

Appellant, Herbert Holbrook, named as executor of the 1951 will and whose wife was a beneficiary thereunder, assumed direc-

tion of Belle's financial affairs after the death of Isaac. Certain witnesses of appellees' testified he also had access to the private papers of Isaac which were deposited in a safe in Belle's home; the 1925 will had always been kept in the safe. Another person who assisted him with Belle's business transactions was appellant, Corbett Hollon, a foster son of Belle's and also a beneficiary under the 1951 will. Holbrook testified that one night, two or three days after Belle had suffered the stroke, Corbett Hollon came to him and informed him Belle wanted to make her will, Hollon saying: "She wants us to go and have it done tonight." Holbrook said he replied: "Corbett, you can't get any business done tonight. Let me talk to Aunt Belle and see if that is what she wants." Holbrook declared he went to see Belle at once and asked her if she desired a will made. She answered in the affirmative, he said, and requested that one be prepared immediately. He then told her they could not get a will drafted that night but that they would attend to it the next morning, and, after some argument, she finally agreed to wait until then. She instructed Holbrook that night, according to him, how she wanted her property disposed of.

The next day Holbrook went to Marcus Mann, an attorney in Salyersville and an ex-brother-in-law of his, and had Mann draft the 1951 will of Belle's. When he presented the instrument to her, he claimed she forthwith sent him out to procure E. D. Tyra, Robert Sewell, William T. Hatton and A. B. Kash as attesting witnesses. These four men came to Belle's home where the document was executed while she reclined on the bed. Holbrook testified the house was full of people, the door of Belle's bedroom was open, and all the legal formalities pertaining to the execution of a will were performed in a conspicuous manner. It should be noted here that the beneficiaries under both the instruments involved in this litigation are either some blood relation of Isaac's or Belle's or are numbered among the various persons Isaac and Belle had raised or are children of those blood kin or of those other persons.

It would lengthen this opinion unduly and serve no beneficial purpose to detail at length the evidence introduced by appellants to sustain the 1951 will and that adduced by appellees to support their contention that Belle was mentally incapable of comprehending her acts and was also subjected to undue influence at the time the 1951 will was executed. We shall therefore summarize the proof relied upon by each side.

Appellants produced in their behalf eleven witnesses, two of whom were doctors. All of these persons testified in substance that Belle on the occasion she signed the 1951 will was rational, mentally alert, fully capable of knowing the natural objects of her bounty and well able to dispose of her property according to a fixed purpose of her own. The medical testimony was to the effect that the stroke did not diminish her mentality. Doctor H. I. Blood, who had waited on Belle during the last years of her life and had treated her for the effects of her stroke, testified he thought her mind was as good as the average person of her age. Doctor Robert B. Simons saw her over a period of twenty days at the Good Samaritan Hospital in Lexington in the spring of 1952, some eight months after the stroke, where she had been taken to be treated for pneumonia and heart failure. It was his view that the stroke had not rendered her mentally incompetent to make a will. However, the doctors, as did the lay witnesses, based their opinions upon observations made by them of her behavior and upon casual conversations had by them previously with her.

Appellees introduced six lay witnesses who testified Belle was mentally lacking at the time the 1951 will was executed. It was brought out by them that the stroke, for some time afterwards, affected her brain to the extent that she talked in an irrational and incoherent manner; that she did not know or recognize her close friends and relatives, including certain foster children

she had raised; that at the time she executed the 1951 will her mind was "very bad" and would "come and go"; and that she did not have sufficient mind and memory to know the extent and value of her property or the persons who were the natural objects of her bounty.

Turning now to the question as to whether undue influence was at any time exerted on Belle, the evidence further shows that, after Belle's stroke, appellants, Corbett Hollon and Vernie Rose, which latter person was likewise a beneficiary under the 1951 will, moved into Belle's home. Vernie testified she assumed the nursing duties necessitated by Belle's illness; the former, as we have already indicated, together with appellant, Holbrook, took over the management and control of Belle's business affairs. One of appellees' witnesses testified Belle at this time "would do anything you would tell her to do. She believed that everybody would do the right thing by her." This same person and two other witnesses of appellees' stated that Belle believed the execution of the 1951 will would in no wise interfere with the 1925 will she and her husband had formerly signed. There was testimony to the effect that other kinsmen were in Belle's home on the occasion of her executing the 1951 will but that these persons were not invited in to see her affix her name to the instrument. One of these kinsmen testified he was sitting on the porch when the 1951 will was read to Belle and he heard some one ask in the presence of Belle: "Will this interfere with Uncle Ike's will in any way?" and in response to this question appellant, Holbrook, replied: "No, no, no, this will not interfere with it * * *." Certain witnesses for appellees stated that appellants, Holbrook and Corbett Hollon, after the execution of the 1951 will, undertook to conceal the transaction.

■ The evidence on each side as to the mental competency of Belle is contradictory. Appellants claim superiority as to the quality of the proof adduced by them in that two of their witnesses who testified Belle had testamentary capacity were medical experts. They also argue that, since all of appellees' witnesses were laymen, the statements of these witnesses on this issue are of scant probative value. This contention does nothing more than go to the weight of the evidence of appellees' witnesses; for it is well established that the testimony of a non-expert witness as to the mental capacity of a testator is nevertheless competent for what it is worth in a will contest case. Thompson v. Jordan, 222 Ky. 788, 2 S.W.2d 640. In Rowland v. Holt, 253 Ky. 718, 70 S.W.2d 5, 9, we said: "* * * Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent minded people." We conclude the court properly allowed the jury to determine the question of Belle's testamentary capacity and we believe the evidence supports their verdict.

■ Where certain beneficiaries or other interested persons are in a position to exercise control over a testator or testatrix and they concern themselves actively with the preparation and the execution of the will of one who has been rendered so helpless physically, if not mentally, by a paralytic stroke as to be susceptible to selfish or improper influence, a presumption arises that the instrument was not executed by a free and unhampered mind. Gay v. Gay, 308 Ky. 539, 215 S.W.2d 92. In our opinion, appellants did not overcome this presumption with counter proof. Moreover, we have also recited additional circumstances which strongly tend to prove the exercise of undue influence upon Belle on the occasion. Therefore, the lower court properly allowed the jury to pass on this question and we are not inclined to disturb their verdict.

■ When we come to consider the purported lost joint will of 1925, we must keep in mind that three requirements are necessary to validate this type of instrument. The proof must establish in a clear and convincing manner the due execution, the contents and the continued existence of

the will unrevoked by the testator. Ferguson v. Billups, 244 Ky. 85, 50 S.W.2d 35. It can scarcely be argued that the first two requirements were not met. Appellees introduced Henry L. Spencer, the attorney who prepared the 1925 will, who testified that pursuant to the instrument he drafted Belle and Isaac devised and bequeathed all the property of each to the survivor of them for life, with the remainder over to Maude Brewer, Hollon Graham, Josie Graham and Dixie Tyra. Spencer stated the 1925 will was duly executed by Belle and Isaac in his presence and in that of Charles Hatton, and that he and Hatton then subscribed their signatures to the instrument as witnesses in the presence of Belle and Isaac. Hatton, appearing also as a witness for appellees, corroborated the testimony of Spencer.

We now consider evidence adduced by appellees to support their position that the 1925 will was never revoked. In this connection, appellee, Josie Graham, testified she saw this instrument in Isaac's possession a few months before he died. Charles Hatton, as we have indicated, stated he was present when the 1925 will was executed by Belle and Isaac. He further testified that, during the year 1950, he saw Belle, talked to her about a small debt he owed her and then remarked: "I guess you still have your business all fixed up" and Belle replied, "Yes, the business is just like your Uncle Ike had it fixed at the time you and Mr. Spencer were there." J. Douglas Graham, an attorney for one of the appellees, took the stand as a witness for appellees and undertook to testify that he was well acquainted with the provisions of the 1925 will and that he saw it for the last time in 1947 in the hands of Belle.

It is maintained the evidence of appellee, Josie Graham, was incompetent because she, a beneficiary under the 1925 will, was testifying for herself concerning a transaction with a deceased person in violation of KRS 421.210(2); and it was also argued below, and is now insisted here, that J. Douglas Graham, because of this same statutory provision, was disqualified to tes-

tify as to the acts and statements of Belle for the reason that he, an attorney in the case representing one of the appellees on a contingent fee basis, was therefore interested in the success of his side of the litigation. See Garnett v. Walton, Ky., 242 S. W.2d 107, upon which appellants rely. The lower court allowed the evidence of appellee, Josie Graham, to be introduced over the objection of appellants, but, accepting the view of appellants, rejected all the testimony offered by J. Douglas Graham. Exceptions were reserved to this ruling and Graham's testimony is before us in the form of an avowal, appellees claiming it was competent.

■ Although the trial judge held the evidence of appellee, Josie Graham, to be competent and that of J. Douglas Graham to be incompetent, we conclude it unnecessary to decide the correctness of these two rulings, for, even if we disregard the evidence admitted as to the one and that offered and rejected as to the other, we still have the testimony of Hatton, the competency of which was not and cannot be questioned, who stated he saw the 1925 will as late as 1950, eight years after the death of Isaac. There was, as has been shown above, this inquiry made of Holbrook in the presence of Belle, at the time she purportedly executed the 1951 will: "Will this (act) interfere with Uncle Ike's will in any way?" and he assured the person addressing him that it would not. Three persons testified Belle believed the execution of the 1951 will, which occurred nine months before her death, would not affect the validity of the 1925 will. These facts lead us to believe there was sufficient proof adduced to support a jury finding that the 1925 will was Isaac's last will and testament and was in existence long after his death. Moreover, this same proof would tend to establish in the minds of a jury that Belle regarded the same instrument as her will up to the time of her death.

■ It is undisputed that appellants, Holbrook and Corbett Hollon, took over to a great extent the management of the

business affairs of Belle as well as that of Isaac after the latter's death. We have pointed out that appellants, Corbett Hollon and Vernie Rose, both beneficiaries under the 1951 will of Belle's, went to live with her after her stroke. Appellant, Holbrook, whose wife was likewise a beneficiary under the same will, according to the evidence of appellees, had access to all the private papers of Belle and Isaac in the safe in Belle's home, where Isaac had placed the 1925 will for safe keeping.

The presumption that a will is revoked when it is not found in the papers of a testator after his death is a rebuttable one. This presumption may be overcome by evidence of the proper execution of the will and continued statements of the testator up to almost the time of his death that he recognized the existence of the lost will, or acts of his that indicated he intended it to remain in force, coupled with proof that an interested person had free access to the instrument and therefore had an opportunity to destroy or otherwise conceal it. These factors were developed by the evidence in this case and they raise an issue for the jury on the question of whether the 1925 will was revoked by Belle, even though it was not found in her papers after her death. See Rowland v. Holt, cited above.

At a pre-trial conference an agreed order was entered, directing the manner in which evidence should be introduced in this case. During the trial, this order was set aside, and appellants complain that this action was prejudicial to their substantial rights. We do not agree. It was within the power of the court to abrogate the order under the circumstances. CR 16 provides that such an order "* * * when entered controls the subsequent course of the action, unless modified at or before the trial to prevent manifest injustice. * * *" We conclude the lower court under the circumstances did not abuse its discretion when it set aside the pre-trial order.

Wherefore, the judgment is affirmed.