## Bennett v. Kissinger et al.

Feb. 28, 1950

As Modified on Denial of Rehearing

June 23, 1950

Wm. J. Baxter, Judge

Rodney Haggard, D. L. Pendleton, R. Russell Grant, for appellant.

S. T. Davis, Redwine & Redwine for appellee.

JUDGE KNIGHT—Affirming.

W. V. Bennett, 67 years of age, died a resident of Clark Couty on February 25, 1947. He had been twice married, his first wife having died many years ago leaving three small children, the youngest of whom was only a few weeks old. These children went to live with their maternal grandmother at Frankfort, and all subsequently moved to Hawaii and California, and never again lived with their father though they retained friendly relationships with him. Later, in June 1912, he married as his second wife Grace C. Bennett who survives him. He had no children by her. On June 17, 1939, Mr. Bennett made a will by which he devised all his property, real and personal, to his wife, Grace C. Bennett, and shortly thereafter, on July 8, 1939, she made a similar will by which she left all her property, real and personal, to her husband, W. V. Bennett.

On February 13, 1947, Mr. Bennett executed a new will in which he revoked all other wills heretofore made by him, bequeathed $100 each to six business associates, including appellee C. B. Kissinger, as tokens of friendship, $500 to the First Baptist Church of Winchester, and $2,000, his automobile, household and kitchen furniture, including antiques, to his niece, Mrs. Stella Sharp, "who is now living with me and keeping house for me and taking care of me, preparing my food and nursing me as the condition of my health requires." The balance of the estate he bequeathed in equal shares to his three children, Mrs. Louise Davis living in Honolulu, Mrs. Virginia Hill and Robert W. Bennett, who reside in California. In the fifth clause he says "I do not make any devise or bequest to my wife Grace C. Bennett

as I have already given her considerable part of my estate." This will was signed,

his

" W. V.　x　Bennett"

mark

and was witnessed by J. M. Stevenson and Katherine Nunan.

This will was offered for probate and was probated in the county court on April 12, 1947, and C. B. Kissinger, nominated in the will as alternate executor, qualified as such and executed bond. The will of June 17, 1939, was offered for probate but was rejected and probate was denied. An appeal was taken from that order to the circuit court and after a trial before the jury and at the conclusion of all the evidence the jury was instructed to find the paper dated February 13, 1947, to be the last will and testament of W. V. Bennett, and the jury returned a verdict in conformity with that instruction. A judgment was entered in accordance with that verdict and this appeal is prosecuted from that judgment.

Whether the court erred in taking the case from the jury and peremptorily instructing it to validate the last will of deceased above referred to is the sole question involved in this appeal. His propriety in doing so depends on whether appellants produced substantial evidence of probative value to show that W. V. Bennett at the time he executed his latest will on February 13, 1947, did not have sufficient mental capacity to know the natural objects of his bounty and his obligations to them, to make a rational survey of his estate and to dispose of it according to a fixed purpose of his own, or whether or not he was under such undue influence from others that the last will he executed was not in reality his will.

The record is a voluminous one and a large amount of evidence was introduced, much of it immaterial and irrelevant to the real issue involved, and much of it repetitious. A great deal of appellant's evidence had to do with the mental condition of testator's wife, Grace Bennett, the treatment accorded her when she was sent to the hospital for the insane, whether or not certain property belonged to her or to Mr. Bennett, the extent

of her business operations, and other similar matters which, while they might have a tendency to arouse the sympathy of the jury, have no real bearing on the issue involved here. Mrs. Bennett, before her marriage to Mr. Bennett, had been secretary to Hon. John M. Stevenson, a leading Winchester lawyer. Later she operated a ready-to-wear shop in Winchester, and still later an antique shop in a laundry building near her home on the Lexington road. For several years prior to her commitment to the mental hospital and the death of Mr. Bennett, she had been carrying on in a limited way her antique business from her home on Gay Street. There is no evidence that her business operations had been profitable, but the home on Gay Street, the family automobile and the furniture, as well as most of the antiques, were in her name at the time of Mr. Bennett's death and did not pass under his will. In the third clause of his last will testator devised to Mrs. Sharpe this automobile, and "my household and kitchen furniture, including china, glassware, and antiques," There is a controversy as to what part of the furniture, particularly the antiques, belonged to the testator and what is owned by his widow.

We pass over without extensive consideration the large amount of evidence produced by appellants seeking to show that Mrs. Bennett was "railroaded" to the mental hospital by some of the appellees who were thereby seeking to obtain use and control of her property. The evidence on this phase of the case convinces us that there was a real emergency existing at the time due to her mental condition, that her own life, the life of her husband, and perhaps others, was in danger because of her mental condition which came to a climax on or about September 25, 1946, when she was committed to the hospital for observation after examination by three reputable doctors. She was later declared insane by a jury in Circuit Court, officially committed, and is now at the hospital. Her interests are now looked after by the appellant, her duly appointed committee, and by attorneys employed by the committee. The estate of Mr. Bennett, amounting to approximately $28,000, is all in personalty. Mrs. Bennett's committee has renounced the will in her behalf and, regardless of the outcome of this litigation, Mrs. Bennett will receive one half of the net proceeds of that estate, her $1,500

exemption, and will, of course, continue to own the home and the personal property standing in her name.

The testator, W. V. Bennett, who had for a number of years been the district representative in Winchester of one of the state's leading life and accident insurance companies, retired actively from that position in 1942, at the age of 62, and was succeeded by C. B. Kissinger, appellee herein. Mr. Bennett remained on a pension of $40.00 per week from his company from his retirement to his death, and perhaps continued to write some insurance individually as a home office representative of his company. He was afflicted with Parkinson's disease, commonly known as palsy, but he continued to make daily trips to the office until shortly before his death. His affairs came to a climax on September 25, 1946, when Mrs. Bennett was sent to the state hospital in Lexington. This left him at home alone with no one to cook and keep house for him, since they had no servant. On the advice of his physician, Dr. Scobee, he was sent to the Clark County hospital where he could receive proper attention. The evidence does not indicate that he was taken to the hospital at that time because of any serious illness, but because of a weakened condition due to lack of food caused by the inability of Mrs. Bennett to prepare it, due to her condition. On this occasion he remained in the hospital until October 13, a period of 18 days, after which he returned to his home. In the meantime, while in the hospital, he had persuaded his niece, Mrs. Stella Sharp, at that time employed in Lexington, to come to Winchester and keep house for him and take care of him as his needs required. She agreed to do this, without any agreement as to remuneration, and, along with her daughter and son-in-law, moved to Mr. Bennett's home about October 1, cleaned it up and had it ready for his return on October 13. During this period, from his return home until his last trip to the hospital in February, his general physical condition considerably improved, that is, he gained weight due to proper and sufficient food and he looked better, although there was no improvement insofar as his permanent disease was concerned. A characteristic of Parkinson's disease is that it worsens progressively and so far as is now known is incurable.

Shortly after his return from the hospital, Mr. Ben-

nett sent for his long time friend and legal adviser, Mr. Stevenson, telling him he wanted to make a will or change his will, and Mr. Stevenson went to Mr. Bennett's home, accompanied by his secretary, for that purpose. At the direction of Mr. Bennett, Mr. Stevenson wrote out in long hand the will as Mr. Bennett wanted it and read back or explained to him the items as he had written them. Nothing was done further at this time toward having the will executed. Mr. Bennett was returned to the Clark County hospital on February 11, 1947, and on February 13, Mr. Stevenson received a call from someone at the hospital that Mr. Bennett wished to see him. Suspecting that he wanted to complete the execution of the will, Mr. Stevenson had the will typed from the pencil memorandum which he had made in October, took it to the hospital and at about 11 o'clock a. m. on the 13th, Mr. Bennett executed the will that is in controversy. Mr. Stevenson did not read the typed will to him, but says he went over the paragraphs with him, and Mr. Bennett said that was what he wanted. Due to his physical condition he could not sign the will but touched the pen as Mr. Stevenson made his mark. Miss Nunan, secretary, who was with Mr. Stevenson when the original memorandum was drawn at Mr. Bennett's home and who was present when the typed will was executed and witnessed it, corroborated the testimony of Mr. Stevenson, and both testified that at the time the will was executed Mr. Bennett had the mental capacity to execute it. Both said they had no doubt whatever about that.

Dr. Scobee, who had long been Mr. Bennett's family physician, attended him while he was at the hospital on both occasions, except the last three days before his death on February 25, when the doctor was away on vacation. He testified that while his physical condition was bad, it was his opinion that he had the mental capacity to make a will and dispose of his property according to a fixed purpose of his own. He testified that he had no doubt about that. A great many other witnesses, associates of Mr. Bennett in business, neighbors, and other who knew and visited him in the hospital, testified that his mental condition was unimpaired and that he was mentally competent to survey his estate and dispose of it by will in the way he desired.

The only medical testimony produced by appellants

to sustain their contention that Mr. Bennett was not competent to make a will was that of Dr. Cole and Dr. Grant. Dr. Cole attended Mr. Bennett at the hospital on the last three days of his life, substituting for Dr. Scobee who was absent. He had not attended Mr. Bennett previously, but was acquainted with him He gave it as his opinion, from his knowledge of the case and from the records, including hospital charts, that it was doubtful if Mr. Bennett had sufficient mental capacity to know the value of his estate and to dispose of his property according to a fixed purpose of his own. Dr. Grant, who knew Mr. Bennett but had never attended him as a physician, testified that from the records of the case, including his examination of the hospital charts, it was his opinion that it was doubtful if deceased had the capacity to make a will at the time he made it. Other evidence introduced, consisting of hospital charts covering the periods deceased was in the hospital, indicate that his physical condition was bad, especially toward the last, and that at times he was unconscious or semi-conscious.

We have carefully read and considered all the voluminous testimony and without further detailing it, we are of the opinion that at the time deceased dictated the terms of his latest will to Judge Stevenson in October 1946, and on the day of its final execution on February 13, 1947, when only Judge Stevenson and his secretary were present, he had sufficient mental capacity to do so and that appellants have not produced sufficient evidence to the contrary to take the case to the jury. We think appellants have produced no more than a scintilla of evidence to sustain their contention.

It would be difficult to believe that a lawyer with the ability, experience and character of Judge Stevenson would have permitted the execution of a will by a man who he knew did not have the mental capacity to do so. He had long been a friend of Mrs. Grace Bennett, his former secretary, as well as of Mr. Bennett. He acted in this case more as a friend than as attorney for deceased since he had retired from the active practice of law and he charged no fee for his services He did not act as an attorney in any capacity after the will was written and is not an attorney of record in this case, appearing only as an apparently disinterested witness.

If there was little evidence to sustain the claim of mental incapacity of deceased, there was still less to sustain any claim that undue influence was exercised on him to make a will which did not represent his real wishes. The only persons in a position to have exercised such influence, and the ones who the appellant infers or intimates might have done so, were appellees Mr. Kissinger, a friend and associate of deceased, who was left a token gift of $100, and Mrs. Sharp, his niece, who tried to make a home for him at his request. There is no evidence that they did so. It is not enough that there was an opportunity to exercise undue influence or a possibility that it was exercised. There must be substantial evidence that it actually was exercised. Jones v. Beckley, 173 Ky. 831, 191 S.W. 627; Clark v. Johnson 268 Ky. 591, 105 S.W.2d 576.

On the whole case we are of the opinion that the evidence was not sufficient to take the case to the jury and that the lower court did not err in refusing to do so.

Wherefore the judgment is affirmed.