I. H. NANCE, Executor, et al., Appellants,

v.

Roscoe VEAZEY et al., Appellees.

Court of Appeals of Kentucky.

Jan. 24, 1958.

Rehearing Denied May 9, 1958.

Franklin & Franklin, Carroll S. Franklin, Madisonville, Thomas L. Withers, Withers & Lisman, Dixon, for appellants.

Neville Moore, Moore & Morrow, Madisonville, for appellees.

CAMMACK, Judge.

This action was instituted in March, 1956, by the appellees, some of numerous second cousins of John V. Brown, deceased, against the appellants, the executor, beneficiaries and legatees under the will of John V. Brown, to contest the will on the ground of mental incapacity. This appeal is from a judgment on a jury verdict declaring that John V. Brown was a person of unsound mind.

The appellants contend that the trial court erred in (1) refusing to instruct peremptorily for the proponents; (2) refusing to admit competent evidence; (3) giving an improper instruction; and (4) admitting incompetent evidence.

The instrument purporting to be the will of John V. Brown was executed on July 25, 1952, when Mr. Brown was more than 70 years old. It was drawn by a lawyer at the home of Mr. Brown and was signed by the testator in the presence of two witnesses. This is the will:

"Will of J. V. Brown

"Know All Men By These Presents

"I, John V. Brown, of Hopkins County, Kentucky, of sound mind and memory do make this instrument my last will and testament as follows:

"1. I hereby appoint I. H. Nance my executor and direct that he sell all my personal property and real estate and convert same into cash, and empower him to convey the real estate and make deed thereto unto the purchaser.

"2. I hereby will and give unto the Olive Branch Church the sum of $500 for the trustees to use in maintaining the Church and Cemetery.

"3. I hereby will and give $100 to each of the following named churches: Rose Creek Church, Pleasant Grove Church, Antioch Church, Christian Church at Slaughters, Methodist Church at Slaughters, Baptist Church at Slaughters, Methodist Church at Hanson, Old Salem Church near Slaughters, Brick Church at Slaughters, Mt. Pleasant Church, Groves Chapel Church, Harmony Church near Vandersburg, Oklahome Church, Mt. Gillard Church.

"4. I will and give unto the County of Webster, Kentucky, the sum of $500 to be used for the purpose of improving and repairing the Webster County Alms House.

"5. To the following persons I will and give $100 each: the daughters of Willis J. Tapp, deceased; the daughters of Jack Tapp, deceased; and Brunett Ragon, Pauline Ragon and Georgia Ragon, and should one or more of these persons be deceased at the time of my death then their parts shall go to the above-named churches.

"6. I hereby direct that all my debts and funeral expenses be paid out of my estate as soon as practicable after my decease.

"7. Also, I will and give unto the Order of Eastern Star the sum of $300 to be used for the purpose of erecting and maintaining its home in or near Louisville, Kentucky, for the needy persons therein.

"8. It is my will and direction that should any one or more persons who are my heirs or beneficiaries herein be instrumental in contesting this will, the ones who do such will be barred from partaking of any part of my estate.

"9. I will and direct that the remainder of my estate, if any, shall go unto the above-mentioned churches, and alms house and Order of Eastern Star.

"In Testimony Whereof, witness my signature this 25th day of July, 1952.

"John V. Brown

"Witnesses
"Lacy Brooks
"Vera Hewlett"

Prior to the execution of the will Mr. Brown had been in poor health. He had suffered a stroke and required hospitalization in 1949. In June and July of 1951 he again required hospitalization and at that time his illness was diagnosed as senile psychosis. Mr. Brown became unable to care for himself and his affairs, and on October 3, 1952, less than three months after the purported will was executed, he was adjudged an incompetent and placed in the care of a committee.

The evidence shows that Mr. Brown had always been an eccentric. His farm of approximately 600 acres, which he had inherited from his parents, began to run down shortly after the death of his father some 35 or 40 years ago. The fences were not kept up, and the fertility of the land was diminished due to improper cultivation. The buildings were never wired for electricity, making it difficult to get tenants. Tenants rarely stayed more than one year because Mr. Brown thought they were taking too much money from him if they raised a good crop.

Mr. Brown bought pure-bred cattle, but due to improper care, they became emaciated. By 1952 he had remaining from a herd of 30 or 40 head only one cow. The others had been lost in poor trades or by starvation.

Mr. Brown had many valued antiques in his home, including a clock, which he would not allow to be moved because it had always stood in the same spot. He kept a stove of his mother's, which he required people to clean whenever they used it. Prior to July, 1952, Mr. Brown began to lose interest in these prized possessions. The clock was given to a stranger and the stove was sold for scrap iron, as were the grates throughout the house. Mr. Brown left himself with no means for cooking his meager food other than small fires built with sticks on the hearth. The house, which was always untidy, became so filthy that the table had to be scraped before relatives would place food upon it.

Mr. Brown had always been a man who paid his own way, but during his later hospitalizations he seemed not to recognize a need for paying his doctors and nurses. A check for $1,000, though later given to a relative to deposit, was carried by him in his pocket like a worthless paper scrap. He made known his desire to sell the timber behind his house, which timber had been sold, cut, and removed some time before. He refused an offer of $20,000 for the oil rights on 70 acres of his land in 1950, but in 1952 he sold the fee to 68 of the same 70 acres for $3,500. (There is some testimony that Mr. Brown refused the $20,000 lease because of the adverse effect it would have on his income tax, and that there was some timber still standing on the farm, though it evidently was not behind the house).

By 1952 Mr. Brown upon occasion forgot the names of persons with whom he was well acquainted. The medical testimony indicates that senile psychosis affects the memory. Two doctors described it as an ailment which will not improve but which may grow worse. The doctors who had treated Mr. Brown stated that in his case it grew progressively worse. They said the disease affects the judgment and that though a person suffering from the affliction may express a plan it could be a plan without reason. On the other hand, the sufferer is said to have occasional lucid intervals when his memory is good. One of the doctors, the employer for some 31 years of one of the contestants, limited the periods of lucidity to a few minutes.

It is not argued that any witness who saw Mr. Brown on the day the will was executed stated that he lacked testamentary capacity on that day. Some neighbors testified that despite his peculiarities he had sufficient mental capacity to make a will. Upon probate of the will the witnesses to it stated that he was mentally competent when he signed it. One of these witnesses was not questioned at the trial in regard to Mr. Brown's competency, but the testimony of other witnesses who saw Mr. Brown on the day the instrument was

executed reaffirms their belief in his competency on that day. One of these witnesses stated that Mr. Brown recalled from memory each beneficiary named in the instrument.

■ The appellants argue that the court should have instructed peremptorily for them because the detailed eccentricities and physical infirmities connoted by the evidence failed to establish mental incompetence of a degree sufficient to prevent the making of a will. Their argument is supported by testimony of numerous friends and relatives of the deceased who opined that he was mentally competent. We believe that there was sufficient conflict in the evidence on the question of mental incapacity to present a question for the jury and that the trial judge was correct in refusing to give a peremptory instruction in favor of the will. The medical testimony which limited lucidity to a few minutes could, in itself, have constituted conflicting evidence sufficient to present a jury question.

■■ The appellants attempted to introduce evidence concerning the reputation of the deceased lawyer who prepared the purported will. They argue that this evidence was competent because a reputable lawyer would not knowingly prepare a will for a person who lacked testamentary capacity, and that it was prejudicial error for the trial court to refuse its introduction. They cite several cases, among them Bennett v. Kissinger, 313 Ky. 417, 231 S.W.2d 74, (wherein we commented upon the favorable reputation of the lawyer who prepared the will) as authority for the competency of this evidence. They urge that it is highly improbable that we would have taken judicial notice of the reputation of an attorney in the case cited, and that surely there was some testimony to substantiate our comments. We do not believe that it was error for the trial judge to exclude this evidence, since the reputation of the lawyer who prepared the instrument was not a material matter. See

Model Code of Evidence, Rule 526, p. 290. Generally, the reputation of a third person is admissible when that person's skill is in issue. Here the skill of the lawyer was not in issue. An attempt was made to put his reputation in issue to show his belief in the competency of the testator. The deceased lawyer's belief on this matter was not an issue on the trial. We do not believe that reputation evidence should be admissible under such circumstances.

■ The appellants argue that Instruction No. 1 is erroneous because it lacks the qualification "if any" following· the italicized portion of this quoted excerpt:

> "A person is of sound mind in making a will if at the time of its execution he has such mental capacity as to enable him to know *the natural objects of his bounty,* (if any), his obligation to them, the character and value of his estate, and to dispose of it according to a fixed purpose of his own." (Emphasis supplied and "if any" inserted to demonstrate point.)

The appellants urge that since Mr. Brown's closest surviving relatives were second cousins he had no natural objects of his bounty and that the instruction assumes otherwise erroneously. The instruction is similar to that found in Watson's Ex'r v. Watson, 137 Ky. 25, 121 S.W. 626, which has been approved many times. Stanley's Instructions to Juries, section 750, p. 573. When a qualification will clarify an instruction we have required its inclusion if there is to be a new trial. See Trosper Coal Co. v. Crawford, 152 Ky. 214, 153 S.W. 211. We do not believe the qualification was necessary in Instruction No. I. There was no implication that Mr. Brown owed any duties to the contestants. See Bramel v. Bramel, 101 Ky. 64, 39 S.W. 520, 522, 18 Ky.Law Rep. 1074, where we said that similar phraseology did not instruct that there was a duty to either the natural objects of the testator's bounty or to the persons upon whom his property was bestowed. Furthermore, since the natural

objects of a testator's bounty include the persons related to him by blood and affection (see 57 Am.Jur., Wills, section 65, p. 82) it is quite probable that the inclusion of the phrase "if any" would have been erroneous in the case at hand. The record shows that Mr. Brown had at least a passive affection for some of his second cousins.

■ The appellants urge vigorously that it was error for the trial court to allow the judgment of the inquest in which Mr. Brown was found to be an incompetent person to be read to the jury. We think this contention is well grounded and are reversing the judgment because of this error. Less mental capacity is required to make a will than to transact business generally. The former requires mental ability only, while the latter may require both physical and mental capacities. Consequently, the issues involved in an inquest to have a person placed in the care of a committee may differ materially from those involved in determining testamentary capacity. The findings of a jury in such an inquest would serve only to confuse and mislead the jury which hears evidence regarding capacity to make a will. Watson's Ex'r v. Watson, 137 Ky. 25, 121 S.W. 626.

The appellees argue that this evidence was competent and that the case of Oder's Ex'r v. Webster, 224 Ky. 551, 6 S.W.2d 690, is controlling here. In that case evidence of an inquest held five years after the execution of a will was held to be competent to corroborate a doctor's testimony concerning progressive mental and physical deterioration. The appellees argue that the testimony relative to the effects of senile psychosis in the case at hand warranted introduction of the inquest results.

■ We believe this case is distinguishable on its facts from the Oder case. In the Oder case there was a conflict in the medical testimony. One doctor testified that the testatrix had no serious sick spells, while another testified that she was suffering from dementia paralytica, a disease of progressive mental and physical deterioration, culminating in mental destruction and, ultimately, death. The Court said that the introduction of the inquest evidence was proper, pointing out that if for no other reason it corroborated the testimony of the doctor who discussed the progressive and fatal disease. In the instant case the doctors are in substantial agreement relative to both the ailment suffered by Mr. Brown and the effects thereof. On fact situations differing from the Oder case we have held such evidence to be inadmissible. See Teegarden v. Webster, 304 Ky. 18, 199 S.W.2d 728. Furthermore, the majority of the Court feel that the prejudicial effect of inquest evidence in a case of this type so far outweighs its probative value as to render it inadmissible. The minority of the Court believe that the evidence should be admissible, but that an admonition concerning its consideration should be given when requested. Therefore, the Oder case, insofar as it allows admission of such inquest evidence in cases involving testamentary capacity, is overruled.

The judgment is reversed and the case is remanded for proceedings consistent with this opinion.